IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

GABRIEL GONZALEZ,
Inmate No. 30515-112,
     Plaintiff,

vs.                           Case No.: 5:16cv34/LAC/EMT

KENDES ARCHER, M.D., et al,
     Defendants.
_____/

## ORDER ON SUMMARY JUDGMENT

Plaintiff, an inmate of the Federal Bureau of Prisons proceeding pro se, initiated this action by filing a civil rights complaint.  Because Plaintiff sues federal employees concerning his treatment at the Federal Correctional Institution at Marianna, Florida ("FCIM"), his complaint is properly construed under the federal counterparts to Section 1983, 28 U.S.C. § 1331 and Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).  Presently before the court is Defendants' Motion for Summary Judgment and incorporated Statement of Facts and Memorandum of Law with attached supporting evidentiary materials (Doc. 70).  Plaintiff filed a response to the motion for summary judgment along with evidentiary materials (Docs. 76, 78, 80).  After careful

consideration of all issues raised by the parties, the Court finds that Defendants'

motion for  summary judgment should be granted.

## I.      INTRODUCTION

Plaintiff's complaint concerns the fact that he could no longer obtain his

prescribed medication for his gastroesophageal reflux disease ("GERD").  He alleges

that Defendants knew of his serious medical condition; denied him his needed

medication, instructing him to obtain it from the prison commissary instead; and,

when the commissary had limited or no supply of his medication, failed to intervene.

Plaintiff thus complains that Defendants' actions amounted to deliberate indifference

to his serious medical needs in violation his Eighth Amendment Rights.  As relief,

Plaintiff seeks injunctive relief and monetary and punitive damages.

## II.     SUMMARY JUDGMENT STANDARD

In order to prevail on a motion for summary judgment, the moving party must

show that the nonmoving party has no evidence to support his or her case or present

affirmative evidence that the nonmoving party will be unable to prove his or her case

at trial.  *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L.

Ed. 2d 265 (1986).  If the moving party successfully negates an essential element of

the nonmoving party's case, the burden shifts to the nonmoving party to come

forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Celotex Corp., *supra*;

Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her.  *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999).  Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove.  *See* Celotex Corp., 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

III.   MATERIAL FACTS

As a federal inmate at FCIM during the time period most relevant to this case, Plaintiff was first prescribed Ranitidine (also known as Zantac) in July of 2010 after

complaints of burning in his chest, particularly when lying down (Doc. 70-10 at 1–2).

He was diagnosed with "Dyspepsia and other specified disorders," which was further

identified as "Temporary/Acute," and he was prescribed 150mg Ranitidine to be

taken twice daily (Doc. 70-10 at 2).  Plaintiff was later diagnosed in April of 2012

with esophageal reflux (Doc. 70-10 at 3).

Plaintiff's prescription continued until September 12, 2014, when it was

cancelled.  On the day before, Plaintiff had a medical visit with Defendant Dr. Kendes

Archer, who authorized the renewal of the Ranitidine prescription, noting Plaintiff's

esophogeal reflux and "past medical hx significant for gerd" (Doc. 70-10 at 5).  Dr.

Archer also ordered that an H-Pilori blood test be taken; the results of which were

negative (Docs. 70-10 at 5; 76 at 22; 70-10 at 16).

However, Defendant Chief Pharmacist Katie Watson then cancelled the

prescription in light of a BOP Formulary requiring that those with Plaintiff's

diagnosis be required to purchase Ranitidine as an over-the-counter medication from

the commissary (Doc. 70-10 at 11).  Watson also noted in particular that Plaintiff's

record of commissary purchases indicated a history of purchasing items known to

exacerbate his reflux symptoms (Docs. 70-10 at 11; 70-6).  The 2013–2014 BOP

National Formulary, which was published on April 15, 2014, provided:

> Non-indigent inmates must purchase all OTC strength "Ranitidine or Omeprazole" from the commissary (for: Relief of heartburn, acid indigestion, sour stomach, prn use, QD use for *Ranitidine and GERD*) unless they are being actively followed in a GI Chronic Care Clinic with documented appropriate laboratory findings (i.e. EGD) for the following: *Severe GERD*, Zollinger-Ellison Syndrome, Schatzki's Ring, Barrett's Esophagitis, Esophageal Stricture, previous GI Bypass or Ulcer Surgery, chronic oral steroid use in transplants, documentation of chronic need for NSAIDS with Prior History of GI Bleed and Short-Term Treatment of H. Pylori.

(Doc. 70-11 at 2) (emphasis supplied).

Upon determining that Plaintiff's condition did not qualify as one serious enough for a Ranitidine prescription, Defendant Archer signed off on the cancellation notice, stating he agreed with the conclusion that Plaintiff would need to purchase his Ranitidine from the commissary (Docs. 70-10 at 10; 70-17 at 2).  Defendant Watson then prepared a form notifying Plaintiff that his Ranitidine prescription was cancelled and he could henceforth buy Ranitidine from the commissary (Doc. 70-10 at 9).

On September 30, 2014, Plaintiff communicated with Defendant Natalie Pelt, an Assistant Health Services Administrator, regarding this change and sought clarification as to whether he should "self-medicate."  Plaintiff was instructed to speak with the pharmacy or with Defendant Health Administrator Gretchen Ryle on the matter (Doc. 70-2 at 4).  After making a separate inquiry as to whether he could receive instruction on how much Ranitidine to take, Plaintiff sent an electronic

message to Defendant Watson on October 8, 2014, stating that he had attempted to purchase Ranitidine from the commissary but none was available.  Plaintiff therefore asked to have his prescription filled so he could receive the medication (Doc. 70-2 at 11–12).  Plaintiff was referred to the pharmacy or to Ryle on the matter.  Plaintiff also attempted to communicate with Defendant Archer on the matter but was informed that Archer was absent for a few days (Doc. 70-2 at 14).  On October 14, 2014, Plaintiff sent inquiry to Ryle on the matter and was informed he should sign up for sick call (Doc. 70-2 at 16).  On November 4, 2014, Plaintiff also sent an electronic message to Defendant Connie Copeland, a Counselor, stating he was having difficulty getting his prescription filled, to which he received a general mailbox reply stating he should consult with the medical staff on the issue (Doc. 70-2 at 20).   Also on November 4, Plaintiff sent a message to Ryle, stating he went to sick call but was told to watch the "call out sheet" for a future appointment; he was told he was scheduled for a November 6 appointment (Doc. 70-2 at 19).

On November 7, 2014, Plaintiff was seen by Defendant Alexander at the medical clinic, during which time a lab test was ordered and Plaintiff was counseled regarding how attention to his diet may reduce his symptoms (Doc. 70-10 at 13–14).  On November 12, 2014, Plaintiff sent an electronic message to Defendant Connie

Copeland, requesting a "BP-8" grievance form so he could file a grievance over his failure to receive his medication (Doc. 70-2 at 21).  It is indicated that Plaintiff received the form on November 17, and he submitted the informal/BP-8 grievance on November 24 (Doc. 70-14 at 2).

In the interim, on November 18, 2014, Defendant Ryle contacted Trust Fund Supervisor Geri Jones (not a defendant) via email, regarding Plaintiff's request for a grievance form and more generally about the availability of Ranitidine (Doc. 70-8 at 9–10).  Jones stated in response that Ranitidine was not available from "the vendor" and that they had to get the medication from Walmart, which was not optimal because Walmart could not supply enough for their needs (Doc. 70-8 at 10). Defendant Ryle replied that Walmart would accommodate preorders of the Ranitidine and stated, "Hope this helps" (Doc. 70-8 at 12).  Jones replied that, even with pre-ordering, the institution was running out of the medication (Doc. 70-8 at 12). Defendant Ryle also brought this issue to the attention of Associate Warden Alice Lowe (not a defendant) on November 19, 2014, by forwarding her email conversation with Jones to her (Doc. 70-8 at 14).

On December 4, 2014, Plaintiff sent the following electronic message to Copeland:

> I have tried for several weeks now to purchase Ranitidine from the commissary and they have been out of stock. I have also tried to purchase Tums as an alternative but they have been out of stock for two months.  As you are aware my chronic care needs are worsening and I am not able to follow the suggestions from medical staff to self-treat my condition with the items available on commissary.  My condition is causing me daily pain and I fear I will suffer permanent esophageal erosion. I request that you contact medical staff and have them issue me an emergency allotment of Ranitidine until such time as the commissary is restocked with a suitable alternative.  Thank you.

 (Doc. 70-2 at 24).  Plaintiff sent similar messages on December 13, 15, and 17, 2014, to Defendants Archer, Watson, and Ryle respectively, complaining of lack of access to Ranitidine or Tums, stating that he was experiencing daily pain, and requesting either an emergency allotment or a renewal of his prescription (Doc. 70-2 at 26, 28, 30).  In each response, Plaintiff was essentially instructed to consult the pharmacy or Ryle during sick call.  On December 22, 2014, Plaintiff received a response to his informal/BP-8 grievance, stating that Ranitidine was now in stock at the commissary but also informing him that "policy doesn't dictate all otc meds must be available" (Docs. 70-3; 70-14 at 2–3).  Plaintiff purchased Ranitidine from the commissary that day (Doc. 70-6 at 1).  Plaintiff also filed a formal/BP-9 grievance on December 24, 2014, in which he related his difficulty obtaining Ranitidine and his dissatisfaction with the discontinuation of his prescription (Doc. 70-9 at 1).  Defendant Warden Nicole English responded to the formal/BP-9 grievance on January 20, 2015, stating

that Plaintiff is required to purchase his medication at the commissary and that the medication is available (Doc. 70-9 at 3).

In the months that followed—until Plaintiff's prison transfer away from FCIM on September 16, 2015—records show that Plaintiff purchased Ranitidine from the commissary only six times, on January 20, 2015, March 10, 2015, April 27, 2015, May 18, 2015, June 1, 2015, and June 29, 2015 (Docs. 70-4, 70-6).  Plaintiff does not dispute this, but he asserts he attempted to purchase Ranitidine from the commissary on other occasions but was told they were out of stock (Doc. 76 at 22).  Plaintiff also relates that, whereas his prescription was for 150mg tablets of Ranitidine, the commissary sold only 75mg tablets in an insufficient number to supply him for the entire week (Doc. 76 at 22).

Plaintiff attests that upon his arrival at his new institution, Forrest City Correctional Institution, in October of 2015, he was restarted on his prescription for Ranitidine 150mg (Doc. 76 at 21).  In October 12, 2016, Plaintiff informed Health Services that, while he had taken Ranitidine for seven years, it appeared to no longer be effective, and that he experiences reflux every night (Doc. 70-10 at 17).  The doctor discontinued his Ranitidine and started him on a prescription for Omeprazole (Docs. 70-10 at 17–18; 76 at 21).  Plaintiff states he continues to suffer from

scratchiness in his throat, and he cannot speak for long periods of time or sing in church, which he attributes to the time at FCIM that he was without Ranitidine (Doc. 76 at 22).

## IV.    DISCUSSION

### A.    Defendant Dr. Archer

This case largely hinges on the actions of Defendant Dr. Archer, for he was the one in charge of Plaintiff's medical care and the one who, by Archer signing the cancellation notice, agreed on a medical basis to the cessation of Plaintiff's Ranitidine prescription.   Dr. Archer states he based his decision upon review of the BOP Formulary and Plaintiff's GERD diagnosis (Doc. 70-17 at 2).   While noting that patients with more serious conditions, which include *severe* GERD, would qualify for continuation of a Ranitidine prescription, Dr. Archer determined that Plaintiff's condition did not qualify as serious or severe (Doc. 70-17 at 2–3 & n.1).   Dr. Archer stated:

> The level and type of GERD Plaintiff has is not the type that would result in severe GERD or more serious conditions.  In my opinion, if left untreated for over a year, let alone, three and a half months, Plaintiff's GERD would not have been exacerbated.
> Reviewing patients records since December 22, 2014, it does not appear that he has had any GERD complications in the over four and a half year period since December 22, 2014, when he was able to purchase Ranitidine in the commissary.

(Doc. 70-17 at 4).

Thus, it was Dr. Archer's medical opinion that Plaintiff's GERD was not serious enough to merit a prescription for Ranitidine under the BOP Formulary, and that opinion has been borne out over time.

In so stating, Dr. Archer also noted that, when he received notice of the fact that Plaintiff was having difficulty obtaining Ranitidine from the commissary, that notice arrived during the same week that the commissary had received its first shipment of Ranitidine after the delay, and Plaintiff obtained Ranitidine shortly thereafter (Doc. 70-17 at 3).

In opposition, Plaintiff provides an affidavit from Daniel S. Fearnow, M.D., a retired medical physician who is incarcerated at Plaintiff's current institution (Doc. 76 at 25–26). Upon review of Plaintiff's medical file, Dr. Fearnow determined that Plaintiff was a chronic care GERD patient. As such, he opined that radiographic or endoscopic testing should have been performed to "determine whether [Plaintiff's] treatment with Ranitidine 150mg./3x daily should be discontinued or changed in some other way" (Doc. 76 at 25–26). Dr. Fearnow acknowledged, however, that medical personnel at Forrest City Correctional Institution changed Plaintiff's prescription to Omeprazole without conducting such tests (Doc. 76 at 26). Dr.

Fearnow stated that episodic treatment of GERD is not favored as it can cause significant aggravation or degeneration of the esophagus, and he took Plaintiff's being switched to Omeprazole as a sign that his condition was advancing symptomatically (Doc. 76 at 25–26).  Plaintiff also submits an affidavit from Thomes M. Lee, a registered surgical nurse, who stated that discontinuing Plaintiff's medication without further testing or an endoscopic exam was not advisable (Doc. 76 at 28).

It is well settled that the government has a constitutional duty to provide minimally adequate medical care to prisoners.  Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991).  However, medical treatment violates the Eighth Amendment "only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'"  Id. at 1505 (citing Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)).   Stating an Eighth Amendment claim of denial of adequate medical care requires satisfying both an objective and subjective component.  Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000).  First, there must be conduct by prison officials which, objectively speaking, is "sufficiently serious" to constitute a deprivation "denying the minimal civilized measure of life's necessities."  Id. (internal quotations omitted).  Second, the prison

officials must possess a subjective intent to use the medical deprivation as a means of punishment.  *Id.* (citations omitted).

As to the objective prong, an objectively serious deprivation requires showing an objectively "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994); *see* Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm.").   In addition, an objectively serious deprivation requires showing the response made by Defendants to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 105–06 (internal quotation marks omitted); *see* Taylor, 221 F.3d at 1257; *see also* Adams v. Poag, 61 F.3d 1537, 1543–44 (11th Cir. 1995).  While delay in providing medical treatment can constitute deliberate indifference in violation of an inmate's constitutional rights, Estelle, 429 U.S. at 104–05, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in

the record to establish the detrimental effect of delay in medical treatment to succeed." Townsend v. Jefferson Cty., 582 F.3d 1252, 1259 (11th Cir. 2009).

As to the subjective prong, Plaintiff must demonstrate that Defendants acted with an attitude of "deliberate indifference." Estelle, 429 U.S. at 105. "Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245–46 (11th Cir. 2003) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) and Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need")). The official must be consciously aware of the medical condition and the need for effective treatment and then callously or recklessly disregard it. *See* McElligott, 182 F.3d at 1257–58; Melton v. Abston, 841 F.3d 1207, 1224 (11th Cir. 2016). Ordinarily, there is no constitutional violation when some measure of treatment is provided. *Id.* at 1259; *see also* Harris v. Thigpen, 941 F.2d 1495, 1504–05 (11th Cir. 1991). However, if the official knew that the present course of treatment went beyond a medical judgment call and was tantamount to no treatment at all, an Eighth Amendment claim would then exist. *Id.* at 1257–58. Thus, a complete denial of

readily available treatment for a serious medical condition constitutes deliberate indifference. *See* Harris v. Coweta Cty., 21 F.3d 388, 393 (11th Cir. 1994). However, where the inmate has received medical treatment, and the dispute is over the adequacy of that treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. Harris, 941 F.2d at 1507 (quoting Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)). To do otherwise would be "to constitutionalize claims that sound in tort law." Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted). Similarly, a difference in medical opinion as to the inmate's diagnosis or course of medical treatment does not support a claim of cruel and unusual punishment. Harris v. Thigpen, 941 F.2d at 1505; *see also* Ross v. Corizon Med. Servs., 700 F. App'x 914, 917 (11th Cir. 2017) (unpublished but recognized as persuasive authority); Magwood v. Sec'y, Fla. Dep't of Corr., 652 F. App'x 841, 844 (11th Cir. 2016); Tucker v. Busbee, 619 F. App'x 868, 871 (11th Cir. 2015) (unpublished).

An Eighth Amendment claim of deliberate indifference requires more than negligence, even gross negligence. Farmer, 511 U.S. at 835–36; McElligott, 182 F.3d at 1255. Medical malpractice, or negligence in diagnosis or treatment, does not rise to the level of a constitutional violation. Estelle, 429 U.S. at 106; Taylor, 221 F.3d

at 1258.  "[A]s <u>Estelle</u> teaches, the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." <u>Adams</u>, 61 F.3d at 1545 (quoting <u>Estelle</u>, 429 U.S. at 107); *see also* <u>Hamm</u>, 774 F.2d at 1575; <u>Williams v. Young</u>, 695 F. App'x 503, 506 (11th Cir. 2017) (unpublished); <u>Wallace v. Hammontree</u>, 615 F. App'x 666, 667–68 (11th Cir. 2015) (unpublished).

The court does not find that Defendant Archer's actions constituted deliberate indifference.  Defendant Archer exercised his medical judgment to determine that Plaintiff's GERD was not severe in form and agreed that Plaintiff could treat his condition by purchasing Ranitidine from the commissary.  He stated that Plaintiff's GERD was not of the type that would become severe and that significant exacerbation would not occur even if his condition were left untreated for longer than a year.  Although Plaintiff states his condition has worsened and he now has a new prescription, Dr. Archer's review of his medical record indicated a lack of complications from GERD.  The affidavit of Dr. Fearnow indicates that further testing should have been performed to better determine Plaintiff's treatment, but he

acknowledged Plaintiff's prescription was changed at Forrest City Correctional Institution without the benefit of further testing.

At best, Plaintiff establishes a case of negligence.  While Plaintiff submits affidavits containing medical opinions as to what tests should have been administered and ostensibly what different course of medical treatment might be recommended thereon, different medical opinions do not form the basis of a constitutional claim of deliberate indifference, nor do claims based on differing diagnostic procedures. Furthermore, despite Plaintiff's subjective complaints, as Defendant Archer noted, there is scant evidence in Plaintiff's medical record to even suggest that his condition has been exacerbated or further complicated due to the temporary unavailability of Ranitidine or the lesser amounts that Plaintiff was able to purchase from the commissary.  Finally, it bears mention that the assumption in Plaintiff's case was not that he was going to be deprived of Ranitidine, but that he was going to have to obtain it on his own through the commissary.  Thus, Dr. Archer's subjective impression was that Plaintiff would be able to obtain his medication as necessary to attend to his needs.  And, as Dr. Archer noted, by the time he was made subjectively aware that Plaintiff was not able to obtain Ranitidine because of the supply problem at the commissary, a new stock of Ranitidine was already arriving.

B.      Remaining Defendants

As for the other Defendants in this action, Defendants Connie Copeland, Gretchen Ryle, Natalie Pelt, Katie Watson, Melanie Alexander, and Nicole English, all in varying degrees acted in accordance with Defendant Archer's medical decision. Although Defendant Watson determined that Plaintiff's Ranitidine prescription was subject to cancellation in accordance with the BOP Formulary, the cancellation notice was first sent to Archer for verification that Plaintiff's diagnosis indeed met the criteria for cancellation.  While Defendant Alexander saw Plaintiff as a Physician Assistant at the medical clinic, she neither changed Plaintiff's diagnosis nor treated him in a manner inconsistent with Archer's diagnosis.  Plaintiff communicated with virtually all of the Defendants regarding his Ranitidine, and he was informed to attend sick call, consult the pharmacy, or contact Defendant Ryle regarding its availability. And, as Plaintiff's questions were routinely funneled to Defendant Ryle, she contacted others within the organization regarding the supply chain and what might be done to improve it.  Defendant Warden English, in response to Plaintiff's formal grievance, informed Plaintiff that he should purchase Ranitidine from the commissary, as it was then available.

Normally, it is not deliberate indifference for nurses or administrative personnel to rely on information and direction provided by qualified medical professionals in carrying out their duties.  Unless such an individual could have reasonably deduced that following such medical direction was tangibly wrong and would result in substantive harm to the inmate, the officer should not be subject to liability.  *See* Townsend v. Jefferson Cty., 601 F.3d 1152, 1159 (11th Cir. 2010) (affirming verdict of no liability where plaintiff had not "presented evidence that her situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged [the prisoner's] condition"); *see also* Bauer v. Kramer, 424 F. App'x 917, 919 (11th Cir. 2011) (unpublished) (finding no deliberate indifference where a nurse followed a doctor's orders to provide medication to an inmate, in the absence of any indication that it was objectively unreasonable to do so); Holloway v. Delaware Cty. Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012) (holding that nurses may generally defer to instructions given by physicians unless it is clear that doing so will likely cause significant harm to the inmate).

Correspondingly, a supervisory defendant is entitled to rely on the judgments of medical personnel.  *See* Williams v. Limestone Cty., Ala., 198 F. App'x 893, 897 (11th Cir. 2006) (unpublished).  A claim of medical indifference cannot generally be

made against non-medical personnel unless they personally involved themselves with a denial of treatment or deliberately interfered with the medical treatment.  Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990).  Unless there is direct evidence to show that a warden or other supervisory official should not rely on such medical expertise, "it would be an unprecedented extension of the theory of supervisory liability to charge . . . wardens, not only with ensuring that [the inmate] received prompt and unfettered medical care, but also with ensuring that their subordinates employed proper medical procedures—procedures learned during several years of medical school, internships, and residencies."  Id.; see also Keith v. DeKalb Cty., Ga., 749 F.3d 1034, 1050 (11th Cir. 2014) (the law does not require that non-medical officials ignore the determination and recommendation of medical staff); Dolihite v. Maughon ex rel. Videon, 74 F.3d 1027, 1054–55 (11th Cir. 1996); Acosta v. Watts, 281 F. App'x 906, 908 (11th Cir. 2008) (finding no liability against prison administrator where administrator's decision-making was grounded in decision made by medical personnel).

More generally, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018,

56 L. Ed. 2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983) "Because vicarious liability is inapplicable to [ ] § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 173, L. Ed. 2d 868 (2009). Under Iqbal, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Id., 556 U.S. at 677. "[S]upervisors are liable under [section] 1983 'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'" Myers v. Bowman, 713 F.3d 1319, 1328 (11th Cir. 2013) (quoting Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010)). Facts sufficient to establish a causal connection include those "which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Keating, 598 F.3d at 762 (internal quotation omitted). The factual allegations must plausibly show that the supervisory official acted with the same mental state required to establish a constitutional violation against his subordinate. See Franklin v. Curry, 738 F.3d 1246, 1250 (11th Cir. 2013).

Furthermore, filing a grievance with a supervisory person does not alone make the supervisor liable for the allegedly violative conduct brought to light by the grievance, even if the grievance is denied.  Wayne v. Jarvis, 197 F.3d 1098, 1106 (11th Cir. 1999); Weaver v. Toombs, 756 F. Supp. 335, 337 (W.D. Mich. 1989), aff'd, 915 F.2d 1574 (6th Cir. 1990); see also Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009); Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984). Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." Tittle v. Jefferson Cty. Comm'n, 10 F.3d 1535, 1542 (11th Cir. 1994).  The failure to act or implement policy must be in the face of repeated violations or other indicators signifying a strong likelihood that the situation will recur.  See Harris v. City of Marion, 79 F.3d 56, 58–59 (7th Cir. 1996).  Supervisors are generally entitled to rely on their subordinates to respond appropriately to situations absent clear or widespread evidence to the contrary.

Beyond the fact that Defendants' actions were guided or governed by Plaintiff's medical status as determined by Dr. Archer, the question becomes whether Defendants were deliberately indifferent with regard to the lack of supply of Ranitidine in the commissary.  Again, the Court finds Defendants' actions were

negligent at best.  As in the Eighth Amendment context, it is well established overall that allegations of negligent conduct do not state a claim of constitutional proportion and are therefore not actionable.  Daniels v. Williams, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); Davidson v. Cannon, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).  While there seems to have been a certain amount of ineptitude in locating and obtaining sufficient amounts of Ranitidine for the institution, this does not evince deliberate indifference.  It is clear that effort was made to obtain a supply; Plaintiff does not show any deliberate intent to deprive him of his medication. Defendants' actions might not be cause for commendation, but they do not form the basis of a constitutional claim.

C.     Qualified Immunity

As part of their summary judgment motion, Defendants assert qualified immunity from suit.  The doctrine of qualified immunity shields government officials from individual capacity suits against them for acts that do not violate a clearly established statutory or constitutional right of which a reasonable person would have known given the circumstances and information possessed by the official at the time of the conduct.  Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); McElligott, 182 F.3d at 1260.  Qualified immunity seeks to ensure that

individuals can reasonably anticipate when their conduct may give rise to liability, and hence, liability only attaches if the contours of the right allegedly violated are sufficiently clear that a reasonable person would understand that what he is doing violates that right.  McElligott, 182 F.3d at 1260 (citing United States v. Lanier, 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L. Ed. 2d 432 (1997)).

The qualified immunity inquiry usually involves two prongs.  To defeat qualified immunity a plaintiff must first show that a constitutional or statutory right has been violated, and second, a plaintiff must show that the right violated was clearly established.  Danley v. Allen, 540 F.3d 1298, 1306 (11th Cir. 2008).  Courts are free to decide which of the two prongs of the qualified immunity analysis should be addressed first, and if the plaintiff fails as to one prong, then qualified immunity exists.  See Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009).

Here, the Court has determined that Plaintiff has failed to establish the violation of a constitutional right; therefore, it is unnecessary to complete the qualified immunity analysis and determine whether that right was clearly established.

D.     Public Health Service Immunity

Finally, though not necessary to the outcome of the case, it bears noting that Defendants Watson and Alexander assert that they are immune from suit because they are employees of the United States Public Health Service (PHS).  The Supreme Court has held that, under 42 U.S.C. § 233(a), PHS officers and employees are not personally subject to liability under Bivens for harms caused during the course of their employment.  *See* Hui v. Castaneda, 559 U.S. 799, 801–02, 130 S. Ct. 1845, 1848, 176 L. Ed. 2d 703 (2010).  These Defendants are thereby immune from actions that arise from the performance of their medical or related functions within the scope of their employment, to include medical, surgical, dental, or related functions.  *Id.* at 805–06.

For the aforementioned reasons, the Court **ORDERS**:

1.      Defendants' Motion for Summary Judgment (Doc. 70) is **GRANTED**.

2.      All other pending motions are **DENIED** as moot.

3.      Judgment shall be entered accordingly and this case closed.

**ORDERED** on this 7th day of April, 2020.

s/ *L. A. Collier*
Lacey A. Collier
Senior United States District Judge